USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 96-1877 UNUM CORPORATION AND UNUM LIFE INSURANCE COMPANY OF AMERICA, Plaintiff-Appellant, v. UNITED STATES OF AMERICA, Defendant-Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Gene F. Carter, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Aldrich, Senior Circuit Judge, ____________________ and Lynch, Circuit Judge. _____________ ____________________ William J. Kayatta, Jr., with whom Jared S. des Rosiers, _______________________ _____________________ Pierce Atwood, Barbara H. Furey, Barry W. Larman, and UNUM ______________ _________________ ________________ ____ Corporation and UNUM Life Insurance Company of America were ________________________________________________________ on brief for appellant. Edward T. Perelmuter, Tax Division, Department of ______________________ Justice, with whom Loretta C. Argrett, Assistant Attorney ___________________ General, and David I. Pincus, Tax Division, Department of ________________ Justice, were on brief for appellee. ____________________ December 2, 1997 ____________________ -2- LYNCH, Circuit Judge. The need to raise capital LYNCH, Circuit Judge. _____________ and to compete in increasingly diversified financial markets has led a number of American mutual life insurance companies to convert to being stock companies. This process, known as "demutualization," often involves a conversion of the mutual policyholders' ownership interest in the old company into ownership interest in the form of stock in the new company. This appeal raises important questions about the proper tax treatment of one form of demutualization: whether stock and cash distributed to policyholders in exchange for their mutual ownership interests as part of a statutory demutualization constitute "policyholder dividends" under 808 of the Internal Revenue Code. If so, the insurer may take a deduction for "policyholder dividends" under 805(a)(3). Whether the "policyholder dividends" deduction is available has great financial consequences for the company and for the public fisc. This question involves consideration of the scope of the "policyholder dividend" under 808, as well as the broader relationship between the general corporate tax provisions of the Code (contained in Subchapter C) and the Code's insurance tax provisions (contained in Subchapter L).  In this case, UNUM Corp. ("UNUM"), the demutualized successor to Union Mutual Life Insurance Co. ("Union Mutual"), seeks a tax refund based on a "policyholder -2- 2 dividends" deduction of over $652 million. This sum, which UNUM was required to distribute to its policyholders by state law, represents the value of Union Mutual's accumulated surplus. See Me. Rev. Stat. Ann. tit. 24-A, 3477 (West ___ 1996).  UNUM's principal argument is that the cash and stock distributed during the demutualization constitute "policyholder dividends" under the plain language of 808(b) and thus are deductible under 805. UNUM further argues that, beyond the statute's plain language, the legislative history and public policy behind the Code's treatment of life insurance companies support this result. The IRS argues that general corporate tax provisions apply to insurance companies in the absence of specific provisions to the contrary in the Code's insurance tax section, and that, under those corporate tax provisions, UNUM is not entitled to any deduction for its reorganization. The IRS argues that nothing in 808 or its legislative history indicates that Congress envisioned 808 as encompassing capital transactions such as UNUM's demutualization. Rather, placed in proper context, 808 is not relevant to the value-for-value exchanges for which UNUM seeks a deduction. -3- 3 The district court entered judgment for the government in UNUM's suit for a refund. We affirm the judgment of the district court. I I This appeal involves only questions of law; we exercise de novo review. Alexander v. Internal Revenue ________ _______________________________ Service, 72 F.3d 938, 941 (1st Cir. 1995). The parties have _______ agreed on the facts. A. Background __________ Demutualization has become increasingly common in the insurance industry. More than 200 mutual life insurance companies have demutualized since 1930. See S. Preston ___ Ricardo, The Deductibility of Policyholder Dividends: UNUM ___________________________________________________ Corp. v. United States, 50 Tax Law. 265, 265 (1996). Between ______________________ 1954 and 1981, the number of mutual insurers declined from 171 to 135; during the same time, the number of stock insurers increased from 661 to 1,823. Edward X. Clinton, The ___ Rights of Policyholders in an Insurance Demutualization, 41 _________________________________________________________ Drake L. Rev. 657, 659 n. 13 (1992). Today, fewer than 80 mutual insurers have assets of over $100 million. See ___ William B. Dunham, Jr., et al., Introduction, in ____________ __ Demutualization of Life Insurers, 648 PLI/Comm 9, 16 (1993). _________________________________ These figures suggest that mutual insurers are rapidly demutualizing, and that new insurance companies prefer the stock form at the outset. -4- 4 State legislatures have facilitated this demutualization process by passing statutes permitting such conversions. Presently, at least forty-one states have specific statutes that provide for demutualization of mutual life insurers. Alexander M. Dye, Distributing Consideration __________________________ to Policyholders, in Demutualization of Life Insurers, 648 ________________ __ _________________________________ PLI/Comm 75, 78 (1993). Only Hawaii and Idaho expressly prohibit direct mutual to stock conversion, although they still permit demutualization through the alternate method of bulk reinsurance conversion. See Clinton, supra, at 673 n. ___ _____ 116. Every state, including those that lack specific demutualization statutes, permits at least some form of demutualization. See id.  ___ ___ There are three usual types of mutual to stock conversions: a statutory conversion whereby the insurer directly converts its form of business, merger with a stock insurer, and bulk reinsurance of the mutual company's policies. See id. at 660-61. This case only concerns the ___ ___ first type of conversion: a statutory conversion, in which a mutual company alters its organizational form to become a stock insurer by redistributing all the mutual policyholder's ownership interest in the mutual insurer into shares of stock in a new stock corporation. "This type of reorganization may properly be regarded as a reorganization of the company -5- 5 because the policyholders are exchanging membership in the mutual for shares in the new corporation." Id. at 660. ___ By demutualizing, mutual insurers can obtain certain advantages available to stock insurers. Stock corporations are better able to raise capital because they may sell stock on the equity markets. See id. at 666-671. ___ ___ Stock companies can more easily diversify their operations by creating upstream holding companies which can own subsidiaries engaged in other businesses. See id. at 671-72. ___ ___ They can also create incentives for superior management performance through stock option plans. See id. at 672-74. ___ ___ Mutual insurers can only raise capital by retaining earnings or charging excess premiums, and are generally subject to comprehensive regulation by state authorities. These limitations can hinder their ability to grow and diversify. See id. at 666. ___ ___ Much is at stake in this process. Mutual insurance companies have historically lagged behind stock insurers in growth of assets and capital. Demutualization and subsequent stock sales may improve a mutual insurer's capital position and competitive standing with other insurers and financial institutions. Mutual insurers naturally want to contend in the increasingly competitive and deregulated financial services markets. Many mutual insurers regard -6- 6 demutualization as an important step toward bolstering their financial strength and flexibility. B. Facts _____ Union Mutual, based in Maine, was organized as a mutual insurance company in 1848. Union Mutual's business was selling various types of insurance and annuity products. As a mutual company, Union Mutual had no stock and was owned by its participating policyholders.1 Policyholders contributed to Union Mutual's surplus by paying premiums that exceeded the actuarial cost of their policy coverage.  In 1984, Union Mutual's management decided to reorganize the company as a stock insurer. The management decided that the company would gain four principal business advantages from this conversion: an increased ability to  ____________________ 1. Mutual life insurance companies do not raise money by issuing capital stock, but rather by charging policyholders a "redundant premium" that exceeds the amount actuarially anticipated to pay the policy's benefits and expenses. The excess portions of these premiums are accumulated, retained, and invested as "surplus".  A mutual insurer's accumulated surplus is the excess of assets over liabilities. Such an excess results from the accumulation of redundant premiums and investment earnings over the life of the company. Surplus generally belongs to the mutual insurer's members in proportion to their contributions, and is generally returned to policyholders through policyholder dividends.  Mutual insurers are thus owned by their policyholders. Policyholders in mutual companies are denominated "members" of the company; their ownership rights in the company are their "membership interests". Members of mutual insurance companies have many of the same rights as stockholders in corporations, including the right to vote and the right to residual surplus upon liquidation.  -7- 7 raise capital, greater flexibility to diversify into new markets, an increased accountability for company performance by management, and an enhanced ability to attract and retain key personnel. Under Maine law, Union Mutual was not permitted to implement its conversion plan until the plan was approved by the Maine Superintendent of Insurance. See Me. Rev. Stat. ___ Ann. tit. 24-A, 3477 (West 1996). Maine law imposes several conditions that a demutualization plan must satisfy in order to receive approval by the Superintendent. These include, inter alia, (1) that the company pay policyholders a _____ ____ "fair and equitable" amount for their ownership interests in the company, (2) that the "equity share" of each policyholder be determined under a fair and reasonable formula based upon the insurer's entire surplus as stated in a financial statement filed with the Superintendent, (3) that the conversion plan give each member of the demutualizing insurer a preemptive right to acquire his or her proportionate part of the proposed capital stock of the new stock company, (4) that the plan provide for payment to each member of his or her entire equity share in the insurer, with the payment to be made in cash or stock of the stock company, and (5) that policyholders entitled to receive stock or cash include all policyholders within three years prior to the date the plan was submitted for approval to the Superintendent. See id.  ___ ___ -8- 8 On December 14, 1984, Union Mutual submitted a plan of recapitalization and conversion to the Superintendent. Union Mutual amended the plan several times in response to rulings by the Superintendent. On July 11, 1986, Union Mutual submitted its fourth and final amended plan, which was approved by the Superintendent on August 8, 1986. The approved plan of conversion may be generally described as follows. A holding company was formed to own all the stock of the new stock company. Those who were "eligible policyholders"2 transferred their "membership interests" in Union Mutual to the holding company in exchange for stock in the holding company. "Membership interests" were defined in the conversion plan as:  [A]ll the rights or interests of each policy and contract holder of Union Mutual including, but not limited to, any right to vote, any rights which may exist with regard to the surplus of Union Mutual not apportioned by the Board for policyholder dividends, and any rights in liquidation or reorganization of Union Mutual, but shall not include any other right expressly conferred by a policyholder's insurance policy or contract.  ____________________ 2. "Eligible policyholders" were generally defined in the conversion plan as all Union Mutual policyholders during the three years prior to December 31, 1984.  -9- 9 Eligible policyholders who qualified as "cash option eligible policyholders"3 could elect to exchange their membership interests for cash instead of stock. The holding company, after obtaining 100% of the membership interests in Union Mutual, exchanged the membership interests for 100% of the shares of the newly formed stock insurer. The holding company sold stock not issued to policyholders to insiders and the general public. At the conclusion of the Plan, UNUM Life Insurance Co. ("UNUM Life"), the new stock company, was a wholly owned subsidiary of UNUM, the holding company. UNUM was in turn owned by former Union Mutual policyholders, insiders, and members of the general public. The approved plan included an actuarial formula for calculating the consideration to be paid to each policyholder in exchange for his or her membership interest in Union Mutual. This figure, denominated each policyholder's "equity share" in Union Mutual, was defined as "the dollar amount of that part of Union Mutual's Adjusted Surplus attributable to" the particular policyholder. Each policyholder's "equity share" comprised two components: a "minimum equity share" and the individual's "contribution to statutory surplus". On December 31, 1985, the day Union Mutual presented its consolidated balance sheet for final review by the  ____________________ 3. "Cash option eligible policyholders" were generally defined in the conversion plan as policyholders with equity of less than $2,500 in Union Mutual.  -10- 10 Superintendent, Union Mutual's adjusted surplus was $652,050,097.4 Based on that figure, Union Mutual's management determined that each policyholder should receive a per capita amount of $612.25 as the "minimum equity share". The "contribution to statutory surplus" varied by individual policyholder. The formula for computing a policyholder's "equity share" that is referred to in the plan of conversion reveals this two-component scheme. The plan of conversion also provided for creation of an accounting mechanism known as a Participation Fund Account ("PFA"). The PFA created the functional equivalent of a closed block5 and was allocated assets which, together  ____________________ 4. Surplus can be measured by either statutory accounting principles or generally accepted accounting principles ("GAAP"). The difference between the two methods is primarily one of timing: the costs of selling policies are fully charged when incurred under statutory accounting principles, but are amortized over the expected life of the policies under GAAP. UNUM's accumulated surplus of $652,050,097 was calculated under GAAP.  In UNUM's demutualization plan, "surplus" was defined as "the amount of the surplus of Union Mutual as shown by its financial statement as of the Computation Record Date (December 31, 1985) filed with the Superintendent, as may be confirmed or adjusted in the event of an examination by the Superintendent, including all voluntary reserves but without taking into account the value of nonadmitted assets or of insurance business in force."  5. Some states protect the policyholders by requiring that a mutual insurer establish a "closed block" of business as a condition of demutualization. See N.Y. Ins. Laws. 7312 ___ (West 1997); 40 Pa. Cons. Stat. Ann. 915-A (West 1997). Such statutes generally require the mutual insurer's policies and contracts in force at the time of the reorganization be placed by the reorganized insurer into a "closed block" into which the insurer must allocate assets that, together with -11- 11 with premiums from the participating policies, were actuarially sufficient to pay policy claims and policyholder dividends. Under the conversion plan, the amount of the assets in the PFA could not be distributed to stockholders of the demutualized insurer. As with a closed block, it had to be invested and used for the exclusive benefit of the policyholders. The PFA was designed with the aim that Union Mutual's policyholders would continue to receive policyholder dividends after the demutualization at the same level as before, even though policyholders and stockholders would have competing claims on the earning and profits of the company. The PFA thus was meant to assure policyholders that their reasonable expectations about the investment value of their policies would continue to be met.  The creation of the PFA was an important consideration in the Superintendent's decision to approve the demutualization plan. In his Final Decision and Order, the Superintendent discussed the PFA at some length, observing that Union Mutual policyholders had bought their policies  ____________________ revenue, are sufficient to pay policy claims and policyholder dividends. Thereafter, the insurer may not distribute any earnings or proceeds developed within that block to stockholders. The closed block must be operated for the exclusive benefit of the included policies and contracts, distributions being for policyholder dividend purposes only. See id.; Dye, supra at 115-116.  ___ ___ _____ A PFA may be required as a condition of demutualization in states which do not require a closed block. The Maine demutualization statute does not require a closed block. See ___ Me. Rev. Stat. Ann. tit. 24-A, 3477 (West 1996). -12- 12 with an understanding that policy costs would be continually adjusted through dividends reflecting Union Mutual's actual experience. The Superintendent also noted that, when purchasing their policies, policyholders based their dividend expectations on dividend illustrations shown to them by Union Mutual that were in turn based on the dividends the company had been paying pursuant to the dividend scales current at the time of purchase. The Superintendent concluded: Even though these "illustrations" were not guarantees that dividends would be paid, Union Mutual, in practice, typically paid dividends in accordance with these scales. Based upon these illustrations and upon actual practice, policyholders expect that they will continue to receive these dividends as long as their policies are in force. Therefore, I find it appropriate that the Plan, by creating a mechanism such as the PFA, supports these expectations of future dividends. That the PFA would maintain these expectations was, according to the Superintendent, critical to the acceptability of the conversion plan. Union Mutual implemented its plan of conversion on November 14, 1986. To the 105,098 Eligible Policyholders who selected the Cash Option, Union Mutual distributed $129,129,082. To the remaining 58,561 Eligible Policyholders, Union Mutual distributed 20,489,072 shares of UNUM stock. This stock was assessed as having a fair market value of $25.20 per share, making the total value of the UNUM -13- 13 stock distributed under the Plan equal to $522,471,336. Union Mutual also distributed an additional $609,396 in cash to compensate policyholders for the value of fractional shares created by the conversion formula. In total, Union Mutual distributed $652,209,814 to the Eligible Policyholders during the demutualization. Prior to the demutualization, on October 12, 1984, Union Mutual's tax counsel had asked the IRS for a private letter ruling on the tax treatment of the conversion. Contrary to the position taken by UNUM now, Union Mutual then sought to convince the IRS that the stock distributed to policyholders in exchange for their membership interests in Union Mutual would constitute tax free exchanges under 351 of the Code. UNUM also sought to persuade the IRS that the exchange of the membership interests received by the holding company for common stock of the new stock company would constitute a tax free recapitalization under 368(a)(1)(E). In support of these positions, Union Mutual made a submission to the IRS on March 25, 1985 stating that "the equity interest of Union Mutual's policyholders resemble the rights of stockholders in a corporation and have substantial value." The submission further stated that the Supreme Court, in Helvering v. Southwest Consolidated Group, 315 U.S. _________________________________________ 194 (1942), had characterized a recapitalization as a "reshuffling of a capital structure within the framework of -14- 14 an existing corporation," Id. at 202, and argued that "[t]he ___ exchange of evidences of ownership interest in Union Mutual _________ argues for the exchange being treated as a recapitalization" under the Supreme Court's characterization. Id. (emphasis in ___ original). Union Mutual made another submission to the IRS on November 8, 1985, discussing whether the exchange of the membership interests for cash or stock would be treated as nondeductible redemptions of stock under 302 or as deductible "policyholder dividends" under 808 and 805, although UNUM did not specifically ask for a letter ruling on that subject at that time. On December 16, 1986, the IRS issued its private letter ruling to Union Mutual regarding the proper tax treatment of the demutualization. See Priv. Ltr. Rul. 87-11- ___ 121 (December 16, 1996). The letter ruling stated that the exchange between the policyholders and UNUM of the policyholders' membership interests in Union Mutual for UNUM stock was a tax-free exchange under 351. See id. The ___ ___ ruling also stated that the exchange between UNUM and UNUM Life, the stock insurer that would succeed Union Mutual, of the Union Mutual membership interests for UNUM Life voting common stock was a tax free recapitalization under 368(a)(1)(E). See id. The ruling further stated that the ___ ___ cash distributed to policyholders in exchange for their -15- 15 membership interests constituted value-for-value transfers and were, accordingly, properly characterized as nondeductible redemptions under 302, not deductible "policyholder dividends" under 808 and 805. See id.6 ___ ___ The IRS viewed the stock-for-membership interest exchanges, in contrast, as non-recognition exchanges subject to 351 (no gain or loss recognized to policyholders), 354 (no gain or loss recognized to holding company on exchange of membership interests to converted company for stock, and  1032 (no gain or loss recognized to either holding company or converted company on receipt of property for stock). On its 1986 consolidated federal income tax return, UNUM did not claim a "policyholder dividend" deduction for the cash and stock distributed to policyholders during the demutualization. UNUM had entered into an agreement with the IRS extending the time period within which the IRS could audit the 1986 return, after which UNUM would be given an  ____________________ 6. The IRS has not always held this view regarding the tax treatment of distributions from surplus made during a demutualization. In 1983, the IRS issued a non-binding technical advice memorandum addressing the demutualization of a mutual casualty insurer through merger with a stock insurer. Tech. Adv. Mem. 8409003 (Nov. 4, 1983). In this memorandum, the IRS took the view now advanced by UNUM that cash distributions paid out of surplus to policyholders during the demutualization were policyholder dividends under then 822(e)(2) and 822(c)(11). In 1989, the IRS withdrew this memorandum without comment. Tech. Adv. Mem. 9010003 (Nov. 13, 1989). Because such memoranda are nonbinding, we do not base our conclusions upon them. We nonetheless recognize that the IRS has not consistently maintained the positions it presently advances in this appeal. -16- 16 additional six months within which to decide whether to amend the return to claim a refund. The IRS audit, which ended in 1991, concluded that UNUM had properly characterized the cash distributions as nondeductible stock redemptions under 302 and the stock distributions as made pursuant to nonrecognition exchanges of its stock for property. UNUM thereafter changed its view of the proper tax treatment of the transaction by timely amending its 1986 return to claim the cash ($129,738,478), then the value of the stock ($522,471,336), as deductible policyholder dividends under 808 and 805. UNUM sought a refund in excess of $77 million. The IRS denied these claimed deductions.  In 1993, UNUM filed suit in the district court, seeking deductions and a refund of the $77 million. The district court ruled in favor of the government, holding that the cash and stock distributions could not be construed as "policyholder dividends" under 808. UNUM appeals. II II UNUM makes a colorable but ultimately unpersuasive argument that this appeal involves only the narrow task of interpreting 808 and 805 of the Code. UNUM would have at least a plausible argument that it was entitled to a "policyholder dividend" deduction if those two sections were the only potentially relevant Code sections to this case. But we must construe the Code as a whole. The Supreme Court -17- 17 admonished in Helvering v. N.Y. Trust Co., 292 U.S. 455 _________ ________________ (1934), that "the expounding of a statutory provision strictly according to the letter without regard to other parts of the Act and legislative history [may] often defeat the object intended to be accomplished." Id. at 464. ___ Therefore, courts must  not look merely to a particular clause in which general words may be used, but . . . take in connection with it the whole statute (or statutes on the same subject) and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the Legislature, as thus ascertained, according to its true intent and meaning.  Id. (citation and internal quotations omitted). ___ We conclude that 808 and 805 do not govern this case. UNUM's demutualization constitutes a capital transaction and is accordingly subject to the general corporate tax rules under Subchapter C which govern such transactions. These rules clearly bar any deduction for amounts distributed during a capital transaction. A. Structural Overview ___________________ Because this case involves the interplay between two Subchapters of the Code, we describe them in general terms. Subchapter C is a broadly applicable section of the Code which contains many of the Code's general corporate tax provisions. It applies to all corporations, including mutual and stock insurance companies. See 7701(a)(3) ("When used ___ -18- 18 in this title, . . . [t]he term 'corporation' includes . . . insurance companies."); 7701(a)(8) ("the term 'shareholder' includes a member in an . . . insurance company.").  Subchapter C governs corporate capital transactions and the taxation of all corporate distributions and adjustments, including the organization, operation, liquidation, and reorganization of all corporate enterprises and their distributions to shareholders and associates. See ___ 301-85. Many general rules in Subchapter C as well as additional rules in other sections of the Code contain language that, by their literal terms, bar the deduction UNUM seeks. Sections 162, 311, 354, and 1032 apply with particular force. We explain these sections and discuss why they apply later. Subchapter L, in contrast, is a highly focused section of the Code which specifically governs certain aspects of the taxation of life insurance companies. See ___ 801-818. Subchapter L enacts a special scheme of determining the gross income, deductions, and taxable income of life insurance companies, whether of the stock or mutual variety. It accommodates the unique manner by which life insurance companies raise and distribute capital. One purpose behind this parallel system of income calculation is to determine more accurately the taxable income of life -19- 19 insurance companies than general tax rules otherwise would permit.  While Subchapter L applies specifically to life insurance companies, the existence of Subchapter L does not exempt insurance companies from the application of the rest of the Code. Subchapter L at times specifically displaces otherwise applicable rules. For example, life insurance company taxable income is defined in 801 as "life insurance gross income" reduced by "life insurance deductions". 801(b). "Life insurance gross income" is specifically defined in 803, not the generally applicable definition of gross income provided in 61. And "life insurance deductions" are specifically governed by 804 and 805, even though 804 and 805 incorporate many of the general rules about deductions by reference. But Subchapter L does not alter general tax rules governing subjects not within its ambit. Specifically, Subchapter L does not exempt insurance companies from the general corporate tax rules of Subchapter C "[e]xcept to the extent that [Subchapter L makes] specific provisions." S. Rep. No. 291, 86th Cong., 1st Sess. 39 (1959), reprinted in 1959-2 C.B. 770, 798. ____________ The Supreme Court addressed the relationship between Subchapter C and Subchapter L in Colonial American _________________ Life Ins. Co. v. Commissioner, 491 U.S. 244 (1989). Colonial _____________ ____________ ________ American involved the question of whether "ceding ________ -20- 20 commissions" paid by a reinsurance company to a direct insurer under an indemnity reinsurance contract could be deducted in the year in which they were paid, or whether they had to be capitalized over the estimated life of the underlying policies. See id. at 246-47. The taxpayer argued ___ ___ that the ceding commissions were analogous to certain agents' commissions deductible under 809 and should be similarly deductible. See id. at 249-50. The IRS responded that the ___ ___ ceding commissions were more properly characterized as a type of capital expenditure and should, as is usual for such expenditures, be amortized over their useful life under 263. See id. at 252-53. The Court ruled against the ___ ___ taxpayer, holding that 809 did not expressly provide for the requested deduction and that 263 should apply in the absence of a specific provision to the contrary. See id. at ___ ___ 260. The taxpayer's argument, the Court stated,  at most proves only that Congress decided to carve out an exception for agents' commissions, notwithstanding their arguable character as capital expenditures. We would not take it upon ourselves to extend that exception to other capital expenditures, notwithstanding firmly established tax principles requiring capitalization, where Congress has not provided for the extension. Id. at 252. ___ Under the rule of Colonial American, general __________________ corporate tax provisions of Subchapter C apply to insurance -21- 21 companies unless Subchapter L makes a specific provision to the contrary. The question that this case poses, therefore, is whether the cash and stock distributions made by UNUM during its conversion are made specifically deductible by 808 and 805 of Subchapter L, notwithstanding the fact that they are clearly not deductible under 162, 311, 354, 1032 and other relevant provisions of the Code.  B. UNUM's burden of proof ______________________ It is a now "familiar rule" that an income tax deduction "'is a matter of legislative grace and that the burden of clearly showing the right to the claimed deduction is on the taxpayer.'" INDOPCO, Inc. v. Commissioner, 503 ______________ ____________ U.S. 79, 84 (1992) (quoting Interstate Transit Lines v. __________________________ Commissioner, 319 U.S. 590, 593 (1943)). Deductions must ____________ therefore be "strictly construed" and allowed "'only as there is clear provision therefor.'" Id. (quoting New Colonial Ice ___ ________________ Co. v. Helvering, 292 U.S. 435, 440 (1934)). Subchapter L ___ _________ has been subject to narrow construction because its provisions "give life insurance companies tax benefits over other taxpayers." National Life & Accident Ins. Co. v. ____________________________________ United States, 385 F.2d 832, 833 (6th Cir. 1967). Thus it is _____________ UNUM's burden to demonstrate that the cash and stock distributed during the demutualization constitute deductible "policyholder dividends" under 808.  C. Analysis of UNUM's arguments ____________________________ -22- 22 UNUM's principal argument is that the cash and stock distributions constitute "policyholder dividends" under the plain meaning of 808, 808(b)(1) in particular, and are therefore deductible under 805(a)(3). Bolstering this position are two overlapping contentions: (1) the legislative history and public policy underlying the Code's scheme of life insurance taxation demonstrate that Congress intended the term "policyholder dividend" to include the distributions made during UNUM's demutualization; and (2) because "policyholder dividends" are broader than classic corporate dividends, "policyholder dividends" need not possess the essential characteristics of a dividend -- i.e., they are not subject to the constraints which limit the classic definition of dividends. We reject both arguments. There is no dispute that 805(a)(3) allows life insurance companies to deduct "policyholder dividends" from income. Section 805(a)(3) expressly states: "there shall be allowed the following deductions: . . . --The deduction for policyholder dividends. . . ." 805(a)(3). The real question, rather, is whether the definition of "policyholder dividend" in 808 encompasses the cash and stock distributed during UNUM's demutualization. In this regard, UNUM's principal argument is that the plain meaning of 808 entitles it to deduct the amounts -23- 23 distributed during the demutualization.7 We believe that, in order to make this claim successfully, UNUM must demonstrate that the distributions satisfy both 808(a) and 808(b). Section 808(a) provides that: [F]or purposes of this part, the term "policyholder dividend" means any dividend or similar distribution to policyholders in their capacity as such. 808(a). Under 808(b)(1), upon which UNUM hinges the main body of its argument, a "policyholder dividend" may include: any amount paid or credited (including as an increase in benefits) where the amount is not fixed in the contract but depends on the experience of the company or the discretion of the management. 808(b).  UNUM asserts that the distributions easily satisfy 808(a), which, UNUM claims, merely emphasizes the broad scope of "policyholder dividends." The source of UNUM's authority for this claim is unclear. UNUM seems to rely  ____________________ 7. Section 808(a) and (b) provide in full: (a) Policyholder dividend defined.--for purposes of this part, the term "policyholder dividend" means any dividend or similar distribution to policyholders in their capacity as such. (b) Certain amounts included.--For purposes of this part, the term "policyholder dividend" includes-- (1) any amount paid or credited (including as an increase in benefits) where the amount is not fixed in the contract but depends on the experience of the company or the discretion of the management. (2) excess interest, (3) premium adjustments, and (4) experience-rated refunds. -24- 24 principally on Republic Nat'l Life Ins. Co. v. United States, ____________________________ _____________ 594 F.2d 530 (5th Cir. 1979), in which the court stated that "policyholder dividends" have an "expansive definition" and "include more than just classic dividends." Id. at 532. ___ UNUM seems also to rely on Treas. Reg. 1.811-2(a) (1997), which tracks the language of 808(a), as further evidence of the broad scope of the "policyholder dividend." Because "policyholder dividends" are "expansive", UNUM argues, they necessarily encompass the amounts distributed during the demutualization. We are not persuaded by these arguments, which attempt to sweep the language of 808(a) under the table. Rather, we think that 808(a) presents a major obstacle, which UNUM fails to overcome. UNUM argues that the real test is whether the distributions satisfy 808(b). UNUM focuses its attention on the text of 808(b)(1), arguing: (1) Nothing in the insurance contracts between UNUM and its policyholders addressed the amounts due to the policyholders in a demutualization; therefore the amounts were "not fixed in the contract"; (2) The cash was distributed out of Union Mutual's accumulated surplus, which represents the fruits of the company's considerable business success since its founding; therefore the amounts "depend[ed] on the experience of the company"; (3) Union Mutual's management, though subject to the supervision of the Maine Superintendent of Insurance and -25- 25 obligated to present "fair and equitable" terms to the policyholder, decided the amounts within that range which would be paid to policyholders in exchange for their equity interests; therefore, the amounts were based "on the discretion of management." The combination of these circumstances, UNUM argues, satisfies the elements of 808(b)(1), and thus the distributions are "policyholder dividends" deductible under 805(a)(3), regardless of the general corporate tax provisions contained in Subchapter C. While we recognize that UNUM's argument is plausible, we nonetheless find it unpersuasive. As we explain later, 808(b) describes categories of distributions that may constitute policyholder dividends provided that the definition of 808(a) is met. But UNUM has failed to satisfy us that the term "policyholder dividend" under 808(a) includes value-for-value exchanges that occur during a corporate reorganization such as this. UNUM's argument ultimately suffers from a fundamental defect: it assumes that Congress wished to ignore the context in which the cash and stock distributions took place. We later explain why UNUM's arguments that the distributions fit within 808(a) fail. We first set the stage as to why Subchapter C applies. D. Application of Subchapter C ___________________________ In a paradigmatic recapitalization, the corporation is not allowed a deduction for distributions made in the -26- 26 course of the transaction. See Woodward v. Commissioner, 397 ___ ________ ____________ U.S. 572, 579 n.8 (1970) ("[W]herever a capital asset is transferred to a new owner in exchange for value either agreed upon or determined by law to be a fair quid pro quo, the payment itself is a capital expenditure . . ."); United ______ States v. Houston Pipeline Co., 37 F.3d 224, 226 (5th Cir. ______ ____________________ 1994) ("Stock redemptions, as a general rule, are characterized as capital transactions, and the purchase price of a stock redemption is not deductible.") (footnotes omitted); Jim Walter Corp. v. United States, 498 F.2d 631 _________________ _____________ (5th Cir. 1974) (corporation's purchase of outstanding warrants in connection with issuance of stock and bonds treated as a capital transaction); Frederick Weisman Co. v. ______________________ Commissioner, 97 T.C. 563, 572 (1991) (collecting cases).  ____________ Here, Union Mutual purchased its policyholders' equity interests and transferred them to UNUM. UNUM in turn exchanged the policyholders' membership interests in Union Mutual for stock in UNUM or cash. UNUM was financially in no worse a position after "paying out" $522 million worth of stock to implement the demutualization than it was before the transaction occurred. What changed was the form of ownership, precisely the topic which capital transactions typically involve.8 As for the $130 million distributed in  ____________________ 8. UNUM acknowledged that its demutualization was a capital transaction subject to general corporate tax law when it submitted its May 22, 1985 request to the IRS for a private -27- 27 cash to redeem certain policyholders' interests, UNUM was left poorer. But the Code disallows deductions for such distributions made in redemption. See 311(a). ___ We find that, because UNUM's demutualization is a capital transaction, it is subject to the general corporate tax provisions of Subchapter C unless UNUM carries its burden of showing an exception. These provisions clearly prohibit a company from deducting cash or the value of stock distributed to its policyholders in redemption of their equity interests in the company.  Applying Subchapter C, the Code would clearly disallow UNUM from taking a deduction on the cash distributed ____ during the demutualization. Section 311 provides that a corporation that purchases shares of its stock from a  ____________________ letter ruling regarding whether the conversion would be entitled to tax-free treatment under 351 and 368(a)(1)(E). The IRS treated the demutualization as a capital transaction in its response, see Priv. Ltr. Rul. 87- ___ 11-121 (Dec. 16, 1986), in which it confirmed that the transaction would be nontaxable under those sections and further stated that the cash distributions would be treated as nondeductible redemptions under 302 and the stock distributions would be treated as non-recognition exchanges under 1032. We do not view this as precluding UNUM from changing its position, but that UNUM thought it necessary to ask the IRS for a letter ruling on the general corporate tax implications of its demutualization reflects UNUM's awareness that its restructuring was subject to Subchapter C. -28- 28 shareholder ordinarily may not receive a deduction for that purpose.9 Section 311(a) states: no gain or loss shall be recognized to a corporation on the distribution, with respect to its stock, of its stock (or rights to acquire its stock), or property. 311(a). Congress reinforced the strength of this rule by enacting 162(l) (now 162(k)) after the Fifth Circuit recognized a narrow exception in Five Star Manufacturing Co. ___________________________ v. Commissioner, 355 F.2d 724 (5th Cir. 1966) (deduction ____________ allowed when expenditures made to save the corporation from dire and threatening circumstances). Section 162(k)(1) unreservedly prohibits corporations from taking deductions for distributions made in the course of reacquiring its stock:  Except as provided in paragraph 2, no deduction otherwise allowable shall be allowed under this chapter for any amount paid or incurred by a corporation in connection with the reacquisition of its stock . . . .10   ____________________ 9. The Code treats the membership interests held by Union Mutual's policyholders as "stock". See 7701(a)(7) ("the ___ term 'stock' includes shares in an . . . insurance company"). The Code also treated Union Mutual's policyholders as stockholders in a corporation. See 7701(a)(8) ("the term ___ 'shareholder' includes a member in an . . . insurance company."). 10. Cf. I.R.C. 317(b), providing that "[f]or purposes of ___ this part, stock shall be treated as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property, whether or not the stock so acquired is cancelled, retired, or held as treasury stock." -29- 29 162(k)(1). The reference to "this chapter" is to Chapter One of the Code (I.R.C. 1-1399), which includes both the general corporate tax provisions in Subchapter C and the insurance tax provisions in Subchapter L. While 162(k)(2) does contain some exceptions to the general rule,11 none of these apply to insurance companies. By its literal terms, therefore, 162 forecloses any deduction for the cash distributed by UNUM.12  ____________________ 11. Section 162(k)(2) provides that: (2) Exceptions.--Paragraph (1) shall not apply to-- (A) Certain deductions.--Any-- (i) deduction allowable under section 162 (relating to interest) (ii) deduction for amounts which are properly allocable to indebtedness and amortized over the term of such indebtedness, or (iii) deduction for dividends paid (within the meaning of section 561) (B) Stock of certain regulated investment companies.--Any amount paid or incurred in connection with the redemption of any stock in a regulated investment company which issues only stock which is redeemable upon the demand of the shareholder. The "dividends paid" deduction under 561 does not include policyholder dividends, but only includes dividends as described in 316 "relating to [the] definition of dividends for purposes of corporate distributions". 562(a). 12. The legislative history of 162 supports the conclusion that 162(k) forecloses a deduction for UNUM in this case. The Committee Report suggests that Congress intended 162(l) (now 162(k)) to be construed broadly to foreclose any deduction for payments in connection with redemptions, except for those specifically enumerated in the statute. The conferees intend that the denial of deductibility will apply to amounts paid in connection with a purchase of stock in -30- 30 The Code is equally clear that UNUM may not deduct the value of the stock distributed in exchange for equity _____ interests. Section 354(a) provides No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan or reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization. 354(a). Section 354 thus bars any deduction for the exchange of UNUM stock for the membership interests of Union Mutual pursuant to the conversion plan. And 1032(a) provides No gain or loss shall be recognized to a corporation on the receipt of money or property in exchange for stock (including treasury stock) of such corporation.   ____________________ a corporation, whether paid by the corporation directly or indirectly, e.g., by a controlling shareholder, commonly controlled subsidiary or related party. The conferees wish to clarify that, while the phrase "in connection with [a] redemption" is intended to be construed broadly, the provision is not intended to deny a deduction for otherwise deductible amounts paid in a transaction that has no nexus with the redemption other than being proximate in time or arising out of the same general circumstances. H.R. Conf. Rep. No. 99-841, 99th Cong., 2d Sess at II-168, reprinted in 1986 U.S.C.C.A.N. 4075, 4256. In this case, ____________ there is a clearly established nexus in that the payment "does . . . represent consideration for the [membership interests] or expense related to [their[ acquisition . . . ." Id. at 4257. ___ -31- 31 1032(a). As is the case with 162(k) and 311, these Code sections do not contain provisions excluding insurance companies from their scope. E. Section 808 ___________ We find nothing in 808 that specifically overrides these general rules. Indeed, that 808 does not even mention these rules suggests that it may have nothing to _______ do with capital transactions altogether. Congress has been explicit in those situations when it wished Subchapter L to modify Subchapter C. See 805(b) (modifying the interest ___ deduction under 163, the charitable contributions deduction under 170, the rules for amortizable bond premium under 171, the net operating loss deduction under 172, and the dividends received deductions under 243-245). Congress could have done the same with the Code sections that directly govern UNUM's demutualization. That Congress did not choose to do so strongly suggest that Congress wanted those sections to apply with full force. Our view that Congress did not intend the demutualization process to be exempted from these general tax rules is strengthened when we examine 808(a). UNUM essentially makes a two-step argument regarding 808(a): (1) any distribution which fits the strict language of 808(b) is a "policyholder dividend" for purposes of 808, regardless of the language of 808(a); and (2) because the -32- 32 transaction here is a "policyholder dividend" under 808, UNUM is entitled to a deduction under 805(a)(3). We reject the first prong, so the second collapses accordingly. UNUM argues that the term "policyholder dividend" under 808 is not bound by the constraints that usually characterize dividends, but includes any distribution that can fit within the language of 808(b)(1): "any amount paid or credited . . . where the amount is not fixed in the contract but depends on the experience of the company or the discretion of the management." We reject this reading of 808.  Basic canons of statutory construction require us to consider the language of 808(a) in construing 808(b). See United States Nat'l Bank of Or. v. Indep. Ins. Agents of ___ _______________________________ _____________________ America, Inc., 508 U.S. 439, 455 (1993) (Courts must "at a _____________ minimum . . . account for a statute's full text, language as well as punctuation, structure, and subject matter."). Section 808(a) states: For purposes of this part, the term "policyholder dividend" means any dividend or similar distribution to policyholders in their capacity as such. 808(a). This text may be divided into three components. The "[f]or the purposes of this part" language requires that the definition of "policyholder dividend" has no force beyond Part I of Subchapter L, which specifically involves the taxation of life insurance companies; thus 808 cannot -33- 33 govern a transaction basically within the purview of Subchapter C. The "any dividend or similar distribution" language requires all "policyholder dividends" to possess the essential characteristics of a dividend. Finally, the "to policyholders in their capacity as such" requires that the dividend-like distributions be based on the contractual relationship between the policyholder and insurer. We interpret the language of 808(a) to mean exactly what it says. Any distribution by an insurer to its policyholders must accordingly bear the essential characteristics of a dividend and be based on the contractual relationship between the policyholder and insurer in order to qualify as a "policyholder dividend". And if 808(a) is not satisfied, then 808(b) cannot be satisfied either. UNUM attempts to circumvent the plain meaning of 808(a) by arguing that the language of 316 specifically exempts "policyholder dividends" from the constraints that bind typical corporate dividends. Section 316(a) defines the term "dividend" as follows. For the purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders . . . out of its earnings and profits of the taxable year . . . . 316(a). By its terms, this definition of dividends applies to Subtitle A, 28 U.S.C. 1-1563, which includes the portion of the Code governing income taxation. Section -34- 34 316(b) limits the extent of the application of this definition: The definition in subsection (a) shall not apply to the term 'dividend' as used in Subchapter L in any case where the reference is to dividends of insurance companies paid to policyholders as such.  316(b). UNUM argues that the language of 316(b) demonstrates that "policyholder dividends" have broader scope than "dividends" as defined in 316(a), so it would be erroneous to conclude that policyholder dividends should be deemed a type of dividend as that term is so defined. It is true that 316(b) means that a policyholder dividend under 808 is not limited to distributions out of the insurer's earnings and profits and may include additional amounts from other sources. But, UNUM's assertion notwithstanding, it does not follow that because "policyholder dividends" may include more than classic corporate dividends then "policyholder dividends" may therefore encompass any distribution to policyholders regardless of its context or purpose.13 As Judge Carter appropriately noted,   ____________________ 13. UNUM cites dicta in Republic Nat'l Life Ins. Co. v. __________________________________ United States, 594 F.2d 530, 532 (5th Cir. 1979), describing _____________ the "policyholder dividend" as "expansive." Because policyholder dividends are "expansive," UNUM argues, policyholder dividends can encompass even value-for-value exchanges that occur during a corporate recapitalization. This argument misapprehends the meaning of Republic Nat'l _______________ Life. In that case, the court was referring to the fact that ____ the definition of "policyholder dividend" is expansive relative to the "classic dividend" definition, adding that "Congress intended to include more than just classic -35- 35 The fact that "policyholder dividend" is, in certain respects, broader in scope than "classic dividend" neither implies, nor even suggests, that Congress intended "policyholder dividend" to be construed broadly.   UNUM Corp. v. United States, 929 F. Supp. 15, 20 n.6 (D. _____________________________ Maine 1996). Indeed, the term "policyholder dividend" is still a defined category. That it possesses a broader scope than the term "dividend" as defined in 316(a) suggests only that policyholder dividends are different from ordinary corporate dividends, not that they are fundamentally unlike them.  F. The distributions are not dividends  ___________________________________ This analysis suggests that the lengthy debate as to whether and how policyholder dividends are like or unlike corporate dividends is largely beside the point. All dividends, whether policyholder dividends or corporate dividends, share certain essential characteristics. The focus should be on whether the stock and cash distributions bear the essential characteristics which qualify them as a dividend of any stripe. We find that the cash and stock distributions at issue in this case simply are not "policyholder dividends" as that term is defined, because they are fundamentally not dividends or distributions similar to dividends as 808(a) requires. Because they do not meet  ____________________ dividends" within policyholder dividends. Id.  ___ -36- 36 the definition of 808(a), 808(b) is superfluous. Moreover, because the distributions do not meet the definition of 808(a), they are still subject to the general corporate tax rules of Subchapter C, under which they may not be deducted.14 The economics of the demutualization compel this conclusion. A dividend, even a policyholder dividend, is a unilateral distribution by a company to its owners (who, in the case of mutual life insurance companies, also happen to be customers). No matter how large, a dividend still leaves intact the owner's equity interest in the company. But the cash and stock distributions for which UNUM seeks a deduction were not unilateral distributions by a company to its owners. Both were made in exchange for policyholders' membership interests in the former mutual company. Those who received cash had their equity interests extinguished, transactions amounting to classic redemptions. Those who received stock had their equity converted from one form to another, transactions which were classic non-recognition exchanges.  ____________________ 14. While the holding in this case would be the same whether or not there was a PFA, the existence of the PFA is added evidence that the economic reality of this transaction is that the conversion of mutual membership interests to stock is not a policyholder dividend. The PFA, a crucial element in the decision of the Maine Insurance Commissioner to approve this transaction, is an accounting mechanism which recognizes (in the common sense of the word) that policyholder dividend expectations may be segregated from other ownership interests and the two are not equivalent. -37- 37 No authority exists supporting the proposition that the term "dividend" encompasses such transactions.  UNUM nevertheless argues that the distributions should still be characterized as "policyholder dividends" because, removed from context, they can plausibly be shoehorned into the text of 808(b)(1). Judge Carter deftly explained the fallacy of UNUM's argument as follows: The fact that Congress intended life insurers to be able to deduct any dividend-like distribution to policyholders to the extent of its capital-like component neither implies, nor even gives rise to the inference, that Congress also intended life insurers to be able to deduct any distribution at all to policyholder that contains a capital-like component to the extent of that component. UNUM Corp. v. United States, 929 F. Supp. at 24 n.15. ___________________________ UNUM's argument clouds the reason why 316 distinguishes policyholder from regular corporate dividends. Policyholder dividends typically include a capital component in addition to earnings and Congress wished to provide a deduction for that component. See 805(a)(3); 809 ___ (limiting the extent of the deduction). But the fact that "policyholder dividends" may include additional components does not change the fact that they must still essentially constitute dividends as 808(a) expressly requires. The acknowledgement reflected in 316(b) that policyholder -38- 38 dividends are more expansive than classic dividends does not alter this conclusion. As the district court observed, UNUM's bootstrapping argument ignores other sources of authority on what constitutes a "dividend." In Hellmich v. Hellman, 276 ___________________ U.S. 233 (1928), the Supreme Court described a dividend as  the recurrent return upon stock paid to stock holders by a going corporation in the ordinary course of business, which does not reduce their stock holdings and leaves them in a position to enjoy future returns upon the same stock. Id. at 237. Similarly, the Supreme Court in United States v. ___ ________________ Davis, 397 U.S. 301 (1970), described a "dividend" as a _____ distribution whose  effect is to transfer the property from the company to its shareholder without a change in the relative interest or rights of the stockholders. Id. at 313 (emphasis added). A distribution is "not ___ essentially equivalent to a dividend" if it "result[s] in a meaningful reduction of the shareholder's proportional interest in the corporation." Id. In light of this ___ authority, we do not view distributions of stock or cash by a mutual insurer in consideration for the same value of ownership interest in a mutual company to be a dividend under any definition of the term, including a "policyholder dividend" under 808. -39- 39 The cash distribution is not a dividend or similar to a dividend precisely because it did reduce (to zero) the ownership interest of those policyholders who received cash and left them in no position to enjoy future returns, except as policyholders. Cf. Hellmich, 276 U.S. at 237. It was ___ ________ thus akin to a nondeductible distribution in redemption. In contrast, the stock distribution was not a dividend or similar to a dividend because it was not in the nature of a "recurrent return upon stock paid to stockholders by a going corporation in the ordinary course of business." Id. ___ Rather, it effected a conversion of one form of equity to another through a classic non-recognition exchange. G. Other reasons _____________ The fact that UNUM's demutualization occurred through a holding company suggests additional reasons why UNUM is also not, for other reasons, entitled to a "policyholder dividend" deduction. First, UNUM, which distributed its stock to policyholders in exchange for their membership interests in Union Mutual, is not a "life insurance company" as defined in 816(a); the tax consequences of the stock distributions are accordingly subject to general corporation tax provisions in Subchapter C, which disallow the deduction. See 354(a); 1032(a). ___ Second, the term "amount paid" in 808(b)(1) requires distributions out of the company's surplus, whereas the stock -40- 40 distribution came from the holding company. Union Mutual did not actually "pay" anything in making that exchange. It is true that UNUM is the sole owner of a life insurance company, but having structured the demutualization as it did, UNUM must "accept the consequences of [its] choice." See ___ Commissioner v. National Alfalfa Dehydrating & Milling Co., ____________ ____________________________________________ 417 U.S. 134, 149 (1974).15 Even so, our decision does not rely on the fact that UNUM structured its demutualization through a holding company. Sections 354(a) and 1032(a) would apply to the demutualization regardless of its form, even if Union Mutual distributed stock in the new stock company in direct exchange for the membership interests of its policyholders. UNUM's best argument may be the analogy it draws between a mutual insurance company liquidation and demutualization. When a mutual insurance company is liquidated, its assets are distributed to the policyholders and those distributions may be called dividends. This reorganization, the company says, is functionally equivalent  ____________________ 15. The one aspect of the demutualization involving the stock of a life insurance company was the transaction between the new stock life insurer, UNUM Life, and the holding company, UNUM, in which the stock company exchanged 100% of its shares for 100% of the membership interest in Union Mutual. A transaction between two corporations can not come within the rubric of 808, which involves distributions to "policyholders in their capacity as such." Instead, it constitutes a recapitalization under 368(a)(1)(E), as the IRS confirmed, in response to UNUM's request, in Priv. Ltr. Rul. 87-11-121. -41- 41 to such a liquidation because Union Mutual no longer exists on completion of the demutualization. There are two responses. The first is that the analogy does not work. The very nature of a demutualization fundamentally distinguishes it from a liquidation in that the insurer is still in business after the conversion is complete. In the present case, the policyholders continue to be provided insurance, albeit through a different form of company and under a different name. Indeed, ensuring that Union Mutual would continue to meet its policyholders' reasonable expectations on the investment value of their policies was the very purpose of the PFA, which calculated the amount of assets necessary to pay policy claims, provide policyholder dividends, and satisfy whatever other benefits accrued to policyholders under their insurance contracts. Notably, the Maine Insurance Commissioner gave his blessing to the transaction only on being assured there was sufficient capital preserved, together with premiums, to cover the insured risks in the future. This does not happen in the usual liquidation and, indeed, demonstrates that UNUM's demutualization cannot properly be so characterized.  Secondly, even if the analogy were apt in general, we have little reason to think Congress intended that final distributions of all assets to be within the definition of "policyholder dividends" under 808(a). Congress could -42- 42 easily have provided for this deduction by enacting specific language to that effect. Had Congress wanted to provide insurance companies with a "policyholder dividend" deduction for any distribution to policyholders not fixed in the contract, it could simply have defined "policyholder dividend" as referring to "any distribution." It would not have limited the definition to "dividends or similar distributions" and then left it to the insurance industry to discover massive deductions in the shadows of the statute. Although we think the plain meaning of 808 works against, and not for, UNUM, and mindful of the usual rule that resort to legislative history is inappropriate in such circumstances, we do briefly explain UNUM's policy and legislative history argument. Our primary purpose in so doing is to determine whether there is a clearly expressed legislative intention which would cause us to question application of the usual rule. INS v. Cardoza-Fonseca, 480 ___ _______________ U.S. 421, 432 n.12 (1987). A secondary reason is to note that UNUM's policy arguments are not implausible; they simply do not carry UNUM's burden of showing clearly that Congress intended such a deduction. In support of its statutory argument, UNUM offers an extended account of the legislative history and public policy behind the Code's scheme of life insurance company taxation. UNUM argues that Congress specifically created the -43- 43 "policyholder dividend" deduction to equalize the tax treatment of mutual insurers relative to stock insurers. Under general tax rules, stock companies are not taxed on capital raised by selling stock, but may not deduct amounts paid to redeem that stock. (No tax, no deduction) At the same time, mutual insurers must pay income tax on capital raised by charging redundant premiums; but, absent the policyholder dividend deduction, they may not deduct amounts paid to return capital to policyholders, which typically occur through policyholder dividends. (Tax, but no corresponding deduction) By creating the policyholder dividend deduction in 805(a)(3), UNUM explains, Congress intended to create symmetry in the taxation of mutual insurers and thus provide equal tax treatment for both mutual and stock insurers. UNUM emphasizes the expansiveness of "policyholder dividends" by contrasting them with a "return premium". Return premiums are refunds that occur when a policy is cancelled, where the amount of the refund generally represents that portion of paid premiums not applied to the purchase of coverage up to the time of cancellation. Robert A. Keeton & Alan I. Widiss, Insurance Law: A Guide to ____________________________ Fundamental Principles, Legal Doctrines, & Commercial _____________________________________________________________ Practices 5.11(d)(2) (1988). UNUM explains that these _________ amounts are "fixed in the contract" in that they are based on -44- 44 the terms of the contract. "Policyholder dividends" are, in contrast, any amounts not fixed in the contract, i.e., any distributions from surplus (that depend on the experience of the company or the discretion of management) that are not return premiums. Under Subchapter L, UNUM explains, Congress divided amounts returned to policyholders into the categories of "return premiums" and "policyholder dividend". Return premiums are deductible, because they contain a return of premiums. Policyholder dividends are also deductible, because, like return premiums, they are in part returns of capital. Policyholder dividends are only deductible in part, however, because they can also contain earnings from the investment of the premiums which are nondeductible under general tax law. To account for this, UNUM argues, Congress created an expansive definition of "policyholder dividend" in 808 and enacted 809 to control the extent of the deduction, since the expansive language does not admit limitation. UNUM claims that 809 is the sole mechanism by which policyholder dividends should be limited, not through judicial construction of the scope of the definition of "policyholder dividend" under 808. Policyholder dividends should be, in effect, any distribution that a mutual insurer makes to -45- 45 policyholders out of surplus for any reason, and only the terms of 809 limit the reach of the deduction.  UNUM argues that the facts that Congress created the policyholder dividend deduction to achieve a tax symmetry and that Congress accordingly defined "policyholder dividend" to possess broad scope necessarily compels the conclusion that "policyholder dividends" must even include distributions to policyholders that are fundamentally not dividends. We believe this conclusion is unsupported by the text or policies underlying the statute. UNUM's analysis of the legislative history and public policy underlying the insurance tax provisions of the Code suffers from the same flaw that undermines its statutory argument. Nothing UNUM cites supports the proposition that Congress intended the term "policyholder dividends" to encompass value-for-value exchanges occurring during a corporate reorganization. UNUM's argument fails not because its relies on erroneous facts, but rather because those facts simply do not support the conclusions UNUM wishes to draw. In the end, the mere fact that "policyholder dividends" are not "fixed" by the terms of an insurance contract does not mean that they include any distribution that a mutual insurer makes to its policyholders in any capacity. Under 808(a), in order for a distribution to qualify as a "policyholder dividend", the distribution must -46- 46 occur to policyholders "in their capacity as such" -- i.e., in their capacity as policyholders, not owners. The distribution must also fundamentally be a "dividend or similar distribution." For the reasons explained in the balance of the opinion, we believe that the cash and stock distributions made by UNUM were not dividends. Rather, the cash distribution constituted a nondeductible distribution in redemption, while the stock distribution was part of a non- recognition exchange.  III III In Colonial American, the Supreme Court faced a _________________ case similar to this one. As here, the taxpayer made a colorable argument that Subsection L provided for tax treatment that general tax law otherwise prohibited. Similarly, the IRS responded that the basic policies and structure of the Code defeated the taxpayer's argument. The Supreme Court, explaining its decision in favor of the IRS, stated: It cannot be denied that the language on which petitioner relies, taken in isolation, could be read to authorize the tax treatment it seeks. . . . But when the statutory and regulatory language is parsed more carefully, petitioner's position becomes dubious, and when the language is read against the background of the statutory structure, it becomes untenable.  Colonial American, 491 U.S. at 257. We believe the same to _________________ be true in this case. To accept UNUM's arguments "we would -47- 47 have to conclude that Congress subsumed a major deduction within the fine details of its definition" of the policyholder dividend. Id. at 260. We do not believe that ___ Congress intended to conceal in 808 a deduction of this magnitude. INDOPCO requires a taxpayer to carry the burden of _______ proof that it is entitled to a claimed deduction. Despite UNUM's arguments, we do not believe that 808 and 805 apply to value-for-value exchanges as occurred in this insurance company demutualization.  We affirm the judgment of the district court. Costs to appellees. -48- 48