THOMAS TIERNEY & another[1] *vs.* JOHN HANCOCK MUTUAL
LIFE INSURANCE COMPANY & others.[2]

No. 01-P-435.

Suffolk. October 16, 2002. - July 17, 2003.

Present: CYPHER, SMITH, & GRASSO, JJ.

*Commissioner of Insurance. Insurance,* Demutualization. *Practice, Civil,*
Review of decision of Commissioner of Insurance. *Corporation,* Reorgani-
zation, Mutual life insurance corporation. *Statute,* Construction. *Administra-
tive Law,* Findings, Substantial evidence, Judicial review.

In an action brought by policyholders of a privately held mutual insurance
company, challenging the decision of the Commissioner of Insurance
(commissioner) approving the company's plan to convert to a publicly
traded stock company, the plaintiff policyholders failed to demonstrate that
the commissioner's approval of the plan violated G. L. c. 175, § 19E, the
statute governing such conversions, where the plan provided eligible
policyholders with appropriate consideration in exchange for their member-
ship interests [574-581]; where the allocation of consideration under the
plan was based upon a fair and reasonable formula [581-586], and where
the plan's composition, funding, and proposed operation of a "closed
block" mechanism, which segregated certain assets and policies from the
rest of the newly organized company, was fair, reasonable, and not
prejudicial to the policyholders or the public [586-587].

In an action brought by policyholders of a privately held mutual insurance
company, challenging the decision of the Commissioner of Insurance
(commissioner) approving the company's plan to convert to a publicly
traded stock company, the trial judge properly granted summary judgment
in favor of the defendant company on the plaintiffs' claims of breach of
contract, breach of fiduciary duty, and violations of G. L. c. 93A, where

---

[1]Doris G. Marah. The complaint also recites that it is a class action, and
that the two named plaintiffs brought their claims "individually and on behalf
of other similarly situated policyholders." However, there is no indication in
the record of the meaning of this phrase, or that class action status was sought
under Mass.R.Civ.P. 23, 365 Mass. 767 (1974).

[2]The Commissioner of Insurance, John Hancock Financial Services, Inc.,
and John Hancock Life Insurance Company. The complaint also names
individual directors and former directors of John Hancock Mutual Life Insur-
ance Company. (We refer to the three Hancock companies and the directors
and former directors collectively as the "Hancock defendants.")

those claims were merely reiterations of the plaintiffs' unsuccessful claim that the commissioner's approval of the plan violated G. L. c. 175, § 19E, the statute governing such conversions. [587-590]

CIVIL ACTION commenced in the Superior Court Department on January 7, 2000.

The case was heard by *Allan van Gestel*, J., on motions for judgment on the pleadings.

*Douglas H. Wilkins* for the plaintiffs.

*Peter T. Wechsler*, Assistant Attorney General, for Commissioner of Insurance.

*Edwin G. Schallert*, of New York, for John Hancock Mutual Life Insurance Company & others.

CYPHER, J. In this G. L. c. 30A appeal,[3] the plaintiffs, Thomas Tierney and Doris Marah, challenge a Superior Court judge's decision on cross motions for judgment on the pleadings. The judge upheld the decision of the Commissioner of Insurance (commissioner) approving the plan of John Hancock Mutual Life Insurance Company (JHM) to convert from a privately held mutual insurance company to a publicly traded stock company (plan), John Hancock Financial Services (JHFS). The judge also dismissed the plaintiffs' related claims against the Hancock defendants for breach of contract, breach of fiduciary duty, and violation of G. L. c. 93A, the Consumer Protection Act.

The plaintiffs argue that the commissioner's approval of the plan violated G. L. c. 175, § 19E, the statute governing such conversions, for the following reasons: (1) the aggregate compensation provided to policyholders (also called "members") under the plan was inadequate; (2) the formula used in the plan to allocate consideration among policyholders was unfair and effected an unconstitutional taking of their property; and (3) the segregation of members' policies into a "closed block" deprived them of possible increases in future dividends. Last, the plaintiffs appeal from the Superior Court's conversion of the Hancock defendants' motion to dismiss counts II through X into a motion for summary judgment and the dismissal of those counts. We affirm.

---

[3]The plaintiffs also sought declaratory relief pursuant to G. L. c. 231A.

1. *Background.* In 1998, JHM sought to convert from a mutual company to a stock company, pursuant to G. L. c. 175, § 19E, through a process known as demutualization. Accordingly, JHM submitted a reorganization plan to the commissioner. In November, 1998, the commissioner formed a working group of Division of Insurance staff members and outside consultants, including an actuarial firm, an accounting firm, an investment banking firm, and a law firm, to provide independent advice and assistance in evaluating the plan, pursuant to § 19E. The working group reviewed proposed drafts of the plan and made numerous recommendations to JHM for improvement to the plan.

On August 31, 1999, JHM's board of directors adopted the plan and sought approval from the commissioner. The plan proposed made JHM a subsidiary of a holding company and provided eligible policyholders with stock, cash, or policy credits in exchange for their interests in the mutual company. In September, 1999, JHM sent eligible policyholders a demutualization package consisting of a policyholder information statement, an information guide, a policyholder record, a ballot, taxpayer identification, and a cash/stock compensation card.

On November 17 and 18, 1999, a public hearing on the plan was held. Both plaintiffs submitted written materials. Tierney spoke, as did counsel for Marah.

On November 30, 1999, a special meeting of policyholders was held to vote on the plan, as required by § 19E. JHM reported to the commissioner that 93.72 percent of the votes cast by policyholders were in favor of the plan.

On December 9, 1999, the commissioner issued a decision approving the plan, deeming it in compliance with G. L. c. 175, § 19E. The commissioner found that the plan provided eligible policyholders with appropriate consideration in exchange for their membership interests in JHM and that the allocation of consideration under the plan was based upon a fair and reasonable formula.

The plaintiffs brought this complaint on January 7, 2000, seeking judicial review under G. L. c. 30A, § 14(7). JHM implemented the plan on January 27, 2000. Subsequently, the plaintiffs amended their complaint to include damages caused by the plan's implementation.

After a hearing, the trial judge allowed the commissioner's motion for judgment on the pleadings, denied the plaintiffs' cross motion, and allowed the Hancock defendants' motion to dismiss all other counts. The judge concluded that the commissioner's decision was supported by substantial evidence, was not based on an error of law, and was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

2. *Aggregate value of JHM — appropriate consideration.* The commissioner concluded that the plan provided all policyholders with appropriate consideration. We agree. There was substantial evidence that there was appropriate consideration based on a fair and reasonable formula. Such evidence included an anti-takeover provision in the demutualization plan as allowed by § 19E; written and oral testimony that the policyholders received JHM's entire surplus; and reports by both JHM's outside financial advisor and the commission's own independent financial advisor that the policyholders received appropriate, fair, and reasonable consideration. The plaintiffs have failed to present any evidence, beyond mere conclusions, that the plan did not provide them with appropriate consideration. See *Pinecrest Village, Inc.* v. *MacMillan*, 425 Mass. 70, 75 (1997) (absent powerful evidence to the contrary, expert technical knowledge of an administrative agency should not be disturbed).

The plaintiffs offer two reasons to support their claim that the commissioner erred in concluding that the plan provided appropriate consideration. First, the plaintiffs contend that the plan's definition of "member interests" was too narrowly construed under § 19E(3). Second, the plaintiffs argue that, by determining policyholders' compensation by means of an initial public offering (IPO), the plan undervalued JHM.

a. *Member interests.* The plan compensated members for the loss of their right to elect the directors, and for their portion of the company's surplus. Members were also assured continued dividends into the future, after demutualization. The plan is consistent with G. L. c. 175, § 19E(3), as amended by St. 1993, c. 226, § 14A, which provides in pertinent part:

"In exchange for all membership interests in the company, such plan shall give each eligible policyholder appropriate

consideration . . . [which] shall be based upon the insurer's entire surplus . . . ."

The plan defined membership interests as "all the rights or interests in respect of each insurance policy and annuity contract of [JHM] including, but not limited to, any right to vote and any rights which may exist with regard to the surplus of [JHM] not apportioned or declared prior to the Effective Date by the Board for policyholder dividends, including any such rights in liquidation or reorganization of [JHM], but shall not include any other benefits, values, guarantees, dividend rights or other rights expressly conferred by an insurance policy or annuity contract."[4]

The plan's definition of member interests is consistent with independent industry materials submitted by the parties with the record appendix, which consistently describe membership interests as principally including voting rights, a right to surplus, and a right to a share in the assets upon liquidation of the company. See Actuarial Standards Board, Allocation of Policyholder Consideration in Mutual Life Insurance Company Demutualizations, Exposure Draft 2 (April 1999) (Exposure Draft) ("[t]ypical membership rights include liquidation rights and voting rights"); Dye, Distributing Consideration to Policyholders, 648 Practicing L. Inst. 75, 81 (1993) (Dye) ("[s]uch [membership] rights include [i] the right to vote on matters submitted to a vote of policyholders and [ii] the right to share in the distribution of assets of the mutual, after provision for all liabilities, upon liquidation"); Society of Actuaries, Report of the Task Force on Mutual Life Insurance Company Conversion, 39 Transactions 295, 300 n.3 (1988) (SOA Task Force Report) ("[m]embership rights include, principally, the right to receive dividends [surplus], to elect directors and to receive the net value of the company in the event of its liquidation"). See also *Keystone Auto. Club Cas. Co.* v. *Com-*

---

[4]The policyholders' membership interests do not include the policyholders' contractual rights arising under their insurance policies or annuities because the demutualization does not reduce the policy benefits, values, premiums, guarantees or policy dividend rights. See Dye, Distributing Consideration to Policyholders, 648 Practicing L. Inst. 75, 83 (1993).

*missioner of Int. Rev.*, 122 F.2d 886, 890 (3d Cir. 1941), cert. denied, 315 U.S. 814 (1942); *Mutual Fire Ins. Co.* v. *United States*, 142 F.2d 344, 346, 348 (3d Cir.), cert. denied, 323 U.S. 729 (1944); *Mutual Benefit Life Ins. Co.* v. *Herold*, 198 F. 199, 206-212 (D.N.J. 1912), aff'd, 201 F. 918 (3d Cir.), cert. denied, 231 U.S. 755 (1913).

The plaintiffs argue that the plan did not compensate them for *all* of their membership interests as required by § 19E(3). Specifically, the plaintiffs contend that the plan failed to provide consideration for their "ownership interests," alternatively characterized as beneficial, equitable, or legal interests.

There was no error. "[P]olicyholders, unlike stockholders in a corporation, do not have an ownership interest that can be transferred to others[;] they nevertheless have a financial interest in the mutual insurance company. Policyholders are entitled to participate in the annual surplus of the company, which represents excess premiums or overcharges paid by the policyholders." *Harhen* v. *Brown*, 46 Mass. App. Ct. 793, 808 n.14 (1999), *S.C.*, 431 Mass. 838 (2000) (rev'd on other grounds). The plaintiffs' argument that a demutualization is equivalent to a liquidation, and thus, the aggregate distribution should have been larger, is also unavailing. See *UNUM Corp.* v. *United States*, 130 F.3d 501, 516 (1st Cir. 1997), cert. denied, 525 U.S. 810 (1998) ("[t]he very nature of a demutualization fundamentally distinguishes it from a liquidation in that the insurer is still in business after the conversion is complete").

Here, the plan provided policyholders consideration for their membership interests, as required by the statute. We conclude that the policyholders were not entitled to a distribution of assets, because there was no liquidation.

b. *Initial public offering.* The commissioner approved a process that relied on an IPO containing anti-takeover provisions to determine the aggregate value of members' interests.[5]

---

[5]The plan contained an absolute anti-takeover restriction for two years, with an additional one-year restriction on any hostile takeover. During this period, acquisitions of JHFS stock by any one person, or persons acting in concert, were limited to less than ten percent of the outstanding shares of common stock. General Laws c. 175, § 19E(9), specifically authorizes the use of an anti-takeover provision in a demutualization plan.

For policyholders receiving their compensation through cash or policy credits, the plan contained a "top-up" provision, by which the value assigned to their interests was limited to the average IPO stock price paid within the first twenty days of trading, up to a maximum of 120 percent of the IPO price. The plaintiffs contend that these limitations unfairly depressed the value of their interests: the anti-takeover provisions, which prohibited acquisition of a controlling interest in JHFS, thereby removed from the marketplace the value represented by the amount investors would be willing to pay if they could gain control of the company.[6] To remedy this, the plaintiffs advocate the addition of a premium[7] to the value established by the IPO in order to achieve a fair aggregate value for their interests. Further, the plaintiffs argue that the market experience in the first twenty days of trading would not be representative of the stock's true market value, which could not be determined until after the anti-takeover provisions expired. This created what the plaintiffs have called a "market discount" of their interests, which, they assert, could be remedied by establishing the company's value by means of an appraisal.[8]

Analogizing themselves to dissenting stockholders of a company being acquired, the plaintiffs refer to case law in which the "fair value," see G. L. c. 156B, § 92, as amended by St. 1983, c. 522, § 22, of the dissenting stockholders' shares is determined by statutory appraisal rights. The plaintiffs cite the "Delaware block" method, which factors market value, earn-

---

[6]This is referred to as a "minority discount." "A minority discount recognizes that controlling shares [of stock] are worth more in the market than are noncontrolling shares." *Shear* v. *Gabovitch*, 43 Mass. App. Ct. 650, 678 (1997), quoting from 12B Fletcher, Cyclopedia of Private Corporations § 5906.120, at 435 (1993).

[7]Called a "control premium" — "[a]n amount (expressed in either dollar or percentage form) by which the pro rata value of a controlling interest exceeds the pro rata value of a noncontrolling interest in a business enterprise." Pratt, Business Valuation Discounts and Premiums 18 (2001).

[8]The plaintiffs cite no authority, and we find none, that discusses "market discount." A similar term, "marketability discount," applies to closely-held corporations. See *Lawson Mardon Wheaton, Inc.* v. *Smith*, 160 N.J. 383, 398-399 (1999) ("marketability discount," as opposed to "minority discount," "adjusts for a lack of liquidity in one's interest in an entity, on the theory that there is a limited supply of potential buyers for stock in a closely-held corporation").

ings value, and net asset value, and assigns a percentage to each of these in a manner that fits the particular company, as an appropriate model for determining the "fair value" of a company. See *Piemonte* v. *New Boston Garden Corp.*, 377 Mass. 719, 724 (1979); *Sarrouf* v. *New England Patriots Football Club, Inc.*, 397 Mass. 542, 547-548 & nn.8, 9 (1986); *BNE Mass. Corp.* v. *Sims*, 32 Mass. App. Ct. 190, 194-195 & n.8 (1992). Under this approach, actual market value (i.e., the historic price of stock shares) is a relevant factor in determining "fair value" only if there is an established market for a particular stock. *Piemonte* v. *New Boston Garden Corp.*, 377 Mass. at 725. Since there was no established market for JHFS, the plaintiffs argue that use of the IPO to establish the value of members' interests was inappropriate.

We note first that, by the terms of G. L. c. 175, § 30(2), the appraisal rights provided for in G. L. c. 156B, §§ 86-98, are inapplicable to insurance companies. Second, while the Legislature could have required an appraisal to determine the aggregate value to be distributed to policyholders, see, e.g., the California and Wisconsin demutualization statutes, discussed in Dye, *supra* at 101-103, it did not do so. Rather, our demutualization statute requires that eligible policyholders be given "appropriate consideration" for their interests, determined under "a fair and reasonable formula approved by the commissioner." G. L. c. 175, § 19E(3).

Although the commissioner found that the plan provided all policyholders with appropriate consideration, she made no explicit findings on the fairness of using an IPO to determine the aggregate value of policyholders' interests. Nor does it appear that she solicited expert advice on the question in this proceeding. For example, the firm of Wasserstein Perella & Co. was retained by the commissioner to provide "an opinion as to the fairness, from a financial point of view, to the Eligible Policyholders of the John Hancock Mutual Life Insurance Company . . . as a group, of the exchange of the aggregate Policyholders' Membership Interests for shares of Holding Company Common Stock, cash and Policy Credits, pursuant to the Plan of Reorganization . . . ." While opining that the plan

was fair to eligible policyholders, Wasserstein Perella's opinion letter, prepared for the commissioner and dated September 1, 1999, also stated, "You have not asked for our opinion and we do not express any opinion as to . . . (4) the terms of an IPO, if any, the IPO Price and, in the absence of an IPO, such other price used to determine distributions to Eligible Policyholders pursuant to the Plan, or the fair market value of any shares of Holding Company Common Stock to be issued pursuant to the Plan or the price at which the Holding Company Common Stock issued in connection with the Plan or pursuant to the IPO will trade."

Notwithstanding the absence of any opinion on the fairness of the IPO terms, Wasserstein Perella had provided the commissioner with documentation illustrating what it called an "IPO discount," which appears to be yet another term for the alleged undervaluing of their interests complained of by the plaintiffs, and which the commissioner had acknowledged in her earlier decision on the demutualization of the State Mutual Life Assurance Company. See the commissioner's findings, conclusions, and order in Plan of Reorganization of State Mutual Life Assurance Company of America, Docket No. F-95-1, at 29 (Aug. 2, 1995) (*State Mutual*)[9]: "[T]here is often a discount to the market value of a company in the pricing of an IPO . . . ." The reasons for such a discount were listed in the Wasserstein Perella documents,[10] as was the history of periodic increases in the stock prices of demutualized life insurance companies for

---

[9]State Mutual was the first insurer to file a plan to demutualize under § 19E; Hancock is the second. In 1995, the commissioner approved State Mutual's demutualization plan. That plan was not appealed, under the conditions of a settlement agreement entered into by State Mutual, the Center for Insurance Research, and certain policyholders.

[10]Wasserstein Perella's explanation for the IPO discount included:

"Compensate investors for investing in entity with no public company track record

— IPO stocks have no trading/valuation history to rely on;

— Less public information available regarding the Company's management, products, and strategy."

one year after their initial public offerings.[11] The question of market increases after the date of the IPO offering was addressed in the commissioner's decision in the instant matter:

> "[T]he Plan's 'top-up' provision is beneficial to eligible policyholders because it allows those who receive cash or policy credits to share in the benefit of any short-term appreciation in the stock price without being subjected to the down-side risk of stock ownership. We note that, according to Hancock, it is the only insurer to date to offer such a benefit in its demutualization plan."

Thus, the plaintiffs' essential argument that they should receive some sort of premium above the IPO value was addressed by the commissioner, who found that the twenty-day/120 percent "top-up" provision served that purpose. Whether the period should have been longer, or the percent higher, see note 11, *supra*, was a matter left to the commissioner's wide discretion under § 19E(3).

As noted above, the commissioner made no explicit findings on the broader question of the fairness of using an IPO (as against, e.g., an appraisal) as the means to establish the value of policyholders' interests. However, in her decision in the *State Mutual* proceeding (which is part of the administrative record before us), the commissioner made extensive findings on the question:

> "As a means of determining the price per share of the common stock, I find that the IPO is a fair and reasonable basis on which to calculate the policyholder consideration and policy credits under the Plan. The price per share reflects the value that investors are willing to pay for the stock following informational and marketing efforts by management and underwriters, a review of the offering prospectus and other materials, consultation with industry

---

[11]Wasserstein Perella submitted to the commissioner a chart tracking price changes in ten demutualized companies which showed that the average change in stock price was +15.3 percent twenty days after the IPO; +18.6 percent after sixty days; + 14.8 percent after ninety days; and + 56.0 percent after one year.

experts and research analysts, and a comparison of the Company to comparable companies and alternative investment opportunities as well as taking into account other relevant financial considerations."

*Id.* at 27.

"I find that the IPO is a fair and reasonable method of determining the value of the policyholder consideration, both individually and in the aggregate, and the participation of the Division's financial Consultants[12] will insure that the pricing process will be conducted in an open manner, consistent with industry practice."

*Id.* at 30.

We read the commissioner's decision in the matter at hand as having implicitly adopted her findings in *State Mutual* that the IPO was a "fair and reasonable method of determining the value of the policyholder consideration." Thus, the commissioner's overall finding of fairness is supported by substantial evidence in the record. See *Aetna Cas. & Sur. Co.* v. *Commissioner of Ins.*, 408 Mass. 363, 373 (1990) ("the commissioner's implicit adoption of the findings [s]he made in [her earlier] decision was [not] impermissible"). Cf. *Zachs* v. *Department of Pub. Utils.*, 406 Mass. 217, 221 (1989) (in making finding on public convenience and necessity, department of public utilities could rely on finding made in prior department decision regarding benefits of increased competition in radio paging market).

3. *Allocation among policyholders - "historic-plus" versus "historic-only" formula.* Approximately eighty percent of the consideration distributed to eligible policyholders (the so-called

---

[12]In *State Mutual* (but not in the current matter, as far as we can determine from the record), the commissioner retained oversight in the IPO process. State Mutual signed a letter of agreement providing that the commissioner's advisors would be permitted to monitor the IPO process; the commissioner monitored the pricing of the stock; and the underwriting agreement could not be signed unless State Mutual had complied with the letter of agreement.

In the instant matter, the commissioner's legal advisor, in its "preliminary list of issues," suggested that the commissioner should exercise a similar degree of oversight. The plaintiffs made no complaint about any lack of oversight on the part of the commissioner, although they did complain that John Hancock's advisor in the IPO process had a conflict of interest.

"variable component")[13] was determined using the historic-plus methodology, which, the commissioner explained, "takes into account each policyholder's past contribution to [the mutual insurance company's] surplus as reflected on its most recent annual financial statement, and a projection of that policyholder's future contribution to surplus." The same methodology had been used in the *State Mutual* case and, the commissioner found, "in every major United States demutualization since 1990."

The plaintiffs argue that the commissioner violated the requirement of § 19E(3) that the allocation formula be "fair and reasonable" when she approved JHM's use of the historic-plus formula, and that, in any event, § 19E(3) requires use of the historic-only formula, which considers only policyholders' past contributions to surplus.

a. *Fairness.* In a footnote to their brief, the plaintiffs argue that, by factoring in expected future contributions to surplus under the historic-plus formula, the plan favored larger, more recent policyholders. Neither JHM nor the commissioner disputes this assertion. However, the commissioner noted that, "[b]ecause the aggregate consideration is constant, any change in the method of allocation would necessarily provide more consideration to some policyholders and less to others." The commissioner cited her earlier decision in *State Mutual*, in which she concluded, "[A]ny method of allocation necessarily favors some policyholders over others. . . . The requisite standard under Section 19E[1] is that the Plan be 'not prejudicial' to policyholders, i.e., policyholders as a group. Applying this standard of review to the entire policyholder population requires the Commissioner to harmonize the competing interests of individual policyholders. Therefore, simply because a method of allocation favors some policyholders over others (as do both the historic only and the historic plus prospective methods) does not compel the conclusion that the method is prejudicial to policyholders." *State Mutual, supra* at 48.

The commissioner credited the testimony of JHM's expert,

---

[13]The other twenty percent of the consideration (the "fixed component") was comprised of seventeen shares of stock for each eligible policy, or the equivalent in cash or policy credits, in order to compensate policyholders for the cancellation of their right to vote.

who opined that the historic-plus methodology was "intrinsi-cally fair" and "the only basis that is intellectually supportable as fair." The commissioner further found that his opinion was supported by the 1999 Actuarial Standards Board Exposure Draft as well as the SOA Task Force Report, which stated that the historic-only methodology was "not a useful method," that the task force did not believe the historic-only method "produce[d] a theoretically correct measure of policyholder contributions, in the aggregate or policy-by-policy," and that al-location of policyholder consideration should be "based primarily on the relative contributions of policyholders to the surplus of the company" and such contributions should include both past and anticipated contributions to surplus. The historic-plus method was also endorsed by Tillinghast-Towers Perrin, the actuarial firm retained by the commissioner to review the plan's proposed allocations to eligible policyholders. Tillinghast advised the commissioner that JHM's "use of the contribution principle is consistent with the precedent set in prior U.S. de-mutualizations," and that, "[a]lthough the allocation of the vari-able component was based solely on historic contributions to surplus in two of the earlier, less significant U.S. demutualiza-tions, historic plus prospective contributions have been used in the more recent conversions."

The commissioner found that the evidence offered by the plaintiffs did not refute the conclusion that the allocation formula was fair and reasonable. Even their witness (Hunt) had testified that the plan was not unfair to policyholders as a group. Hunt, the commissioner found, merely testified that he believed the historic-only method was more fair, that use of the historic-plus methodology in other demutualizations did not make it more fair, and that he did not understand how the authors of the SOA Task Force Report had determined that the historic-only method would penalize most of the current individual policyholders.

In reviewing the commissioner's decision concerning a choice of methodology, we "give due weight to [her] experience, technical competence, specialized knowledge, and discretionary authority. Deference to the commissioner's expertise and discre-tion is particularly appropriate when reviewing her choice of

methodology." *Automobile Ins. Bureau of Mass.* v. *Commissioner of Ins.*, 430 Mass. 285, 296 (1999) (citations omitted). As the challenging party, the plaintiffs did not carry their burden "to demonstrate that the decision of the commissioner was incorrect."[14] *Bankers Life & Cas. Co.* v. *Commissioner of Ins.*, 427 Mass. 136, 138-139 (1998).

b. *Required use of historic-only formula.* The plaintiffs next argue that both the legislative history of the statute and the text of § 19E(3) require the use of the historic-only formula.

Section 19E(3) provides, in pertinent part:

> "[S]uch [demutualization] plan shall give each eligible policyholder appropriate consideration. Said consideration shall be determinable under a fair and reasonable formula approved by the commissioner, and *shall be based upon the insurer's entire surplus* as shown by the insurer's financial statement most recently filed with the Commissioner . . . but . . . *without taking into account the value of nonadmitted assets or insurance business in force.*"

(Emphasis supplied.)

The plaintiffs first point to the 1985 demutualization of the Union Mutual Life Insurance Company in Maine, under a statutory provision similar to § 19E(3), where the historic-only formula was approved. See Plan of Recapitalization and Conversion of Union Mutual Life Insurance Company, Final Decision and Order (Aug. 8, 1986) (*Union Mutual*). However, as the commissioner found in her decision, the insurance commissioner in *Union Mutual* ruled only that the Maine statute *permitted* use of the historic-only approach to apportion consideration among policyholders, not that such an approach was *required.* The Maine commissioner ruled:

> "[The conversion statute] permits the relative apportionment of the policyholders' equity in a mutual insurer based solely upon statutory surplus and requires, at a minimum,

---

[14]The plaintiffs' further argument that the commissioner's approval of the plan effected an unconstitutional taking also fails, as the commissioner's approval of the plan, which had already been approved by the majority of policyholders, did not constitute State action. See *Tancredi* v. *Metropolitan Life Ins. Co.*, 316 F.3d 308 (2d Cir. 2003).

an aggregate distribution to eligible policyholders equal to an insurer's statutory surplus. [*Union Mutual, supra* at 8.] . . . Although the contribution to surplus principle permits other approaches . . . I find that it is not inappropriate for the Plan to use contribution to statutory surplus."

*Id.* at 19.

Indeed, in an analysis of the language in H. 390, the House bill that ultimately became § 19E(3), the Legislature's Joint Commission on Insurance commented that the methodology approved by the Maine commissioner in *Union Mutual* "may not be 'appropriate consideration' in every case. It will depend on the financial condition and post-conversion prospects of the reorganized insurer."

The commissioner adopted her findings in *State Mutual*, interpreting the statute's text "shall be based upon the insurer's entire surplus," as referring to the aggregate consideration, rather than the allocation to individual policyholders. This is in accord with the Maine commissioner's interpretation in *Union Mutual*, noted in the Legislature's Joint Commission on Insurance report on H. 390, that the statute "requires, at a minimum, an aggregate distribution to eligible policyholders equal to an insurer's statutory surplus." In *State Mutual* at 46-47 n.32, the commissioner examined the language of numerous earlier demutualization statutes, finding that they "required that policyholder consideration be 'based upon *not less than* the insurer's entire surplus,' " suggesting that "the purpose of the 'based upon' language is to ensure that not less than the entire surplus of a company is given to eligible policyholders, and, therefore, requires that aggregate consideration, as opposed to allocation of consideration, be based upon the insurer's entire surplus." The plaintiffs have made no argument that the aggregate compensation was based on less than JHM's entire surplus.

Moreover, even if the term "based upon" did apply to allocation of consideration, the commissioner observed that the statute does not require that consideration be based "*only* upon the insurer's entire surplus." We agree. If the Legislature had intended such a result, "it presumably would have provided for it with some clarity." *Commonwealth* v. *Brown*, 431 Mass. 772,

775 (2000). Thus, the statute leaves to the commissioner's discretion the allocation of consideration among policyholders under a "fair and reasonable formula," which we have already addressed. See section 3(a), *supra*.

Last, the plaintiffs argued to the commissioner that the statute's exclusion of "nonadmitted assets" and "insurance business in force," "prohibits the reliance upon business plan projections, good will, and future profits, and thus precludes the use of the historic-plus methodology." The commissioner adhered to her decision in *State Mutual*, where she interpreted this language in the statute to mean that nonadmitted assets and insurance business in force must be excluded from the surplus upon which policyholder consideration is calculated, and found that this proviso was complied with in the demutualization plan.[15] As this interpretation comports with the statute's plain meaning, and the commissioner's interpretation is entitled to substantial deference, there is no reason to disturb it. See *Dube* v. *Contributory Retirement Appeal Bd.*, 50 Mass. App. Ct. 21, 23-24 (2000), and cases cited.

4. *"Closed block."* Although not required by § 19E,[16] the plan provided for the creation of a "closed block," a mechanism, the commissioner explained in her decision, designed "to protect the reasonable policy dividend expectations of individual policyholders with certain dividend-paying policies or contracts." A closed block segregates the assets and policies therein from the rest of the newly capitalized public company, thus protecting them from market forces.

The plaintiffs complained to the commissioner that, as proposed in the plan, the closed block was not sufficiently funded. The commissioner found, however, that the plaintiffs produced no evidence to support this contention; the plaintiffs' sole witness on the issue stated that he was not an expert on

---

[15]Since the commissioner, throughout her decision, adopted her findings in *State Mutual*, we assume that the omission of a specific finding in the John Hancock decision that the value of nonadmitted assets and insurance business in force was in fact excluded, as required by the statute, was merely an oversight on her part.

[16]Some demutualization statutes require the creation of a closed block in order to protect policyholders. See *UNUM Corp.* v. *United States*, 130 F.3d at 505 n.5.

closed block matters. Moreover, the plan requires Hancock to satisfy its closed block obligations out of the company's general funds, should the closed block funding be insufficient. In addition, the plan provides for ongoing monitoring of the closed block by the commissioner. The plaintiffs, therefore, have failed to provide evidence sufficient to overcome the commissioner's finding that the "composition, funding, and proposed operation of the Closed Block are fair, reasonable, and not prejudicial to the policyholders or to the insuring public."

In their complaint to the Superior Court, the plaintiffs argued for the first time that the plan's use of a closed block violated their contractual rights because the segregation of their interests would deprive them of the benefits of any cost-cutting or expense reductions in the company that otherwise could result in increased dividends. Now, for the first time on appeal, the plaintiffs argue that this alleged contractual violation, in turn, constituted a violation of § 19E. Since the latter argument was not raised in the Superior Court, it is waived. *Wynn & Wynn, P.C.* v. *Massachusetts Commn. Against Discrimination*, 431 Mass. 655, 674 (2000).

Even were we to consider the merits of the argument, it would fail, as there was no contract violation. Each member's policy states that "the proportion of divisible surplus accruing upon this policy shall be ascertained annually," and that the policy "will be entitled to the share, if any, of the divisible surplus as the Company shall annually determine and apportion to it." The policies do not promise the members that the assumptions on which the dividend expectations are based will never change. See generally *White Fuel Corp.* v. *Liberty Mut. Ins. Co.*, 313 Mass. 165, 168-169 (1943). Furthermore, the plaintiffs have not made us aware of any authority to support their claim.

5. *Dismissal of the common-law and statutory claims.* In counts II through IX, the plaintiffs sought declaratory relief against the Hancock defendants, alleging breach of contract and breach of fiduciary duty. In count X, the plaintiffs alleged violations of G. L. c. 93A. The defendants moved to dismiss these counts pursuant to Mass.R.Civ.P. 12(b)(1) and (6), 365 Mass. 755 (1974). Relying on his rulings on count I (the c. 30A claim), the judge treated the motion as one for summary judgment and allowed it.

We agree with the judge that the "claims in [c]ounts II through X are really nothing more than indirect challenges to the [c]ommissioner's [d]ecision." In this case, the contract, fiduciary duty, and c. 93A claims were inextricably intertwined with the c. 30A claim, and could not be decided "without application of the commissioner's specialized knowledge." *Liability Investigative Fund Effort, Inc.* v. *Medical Malpractice Joint Underwriting Assn.*, 409 Mass. 734, 748 (1991) (*LIFE*).

The contract claims (counts II-VII) allege that the conversion from mutual to publicly-held corporation violated JHM's charter, and that particular features of the Hancock conversion (e.g., closed block, historic-plus methodology) violated both the charter and the provisions of members' individual policies. However, by enacting the conversion statute, the Legislature effectively superseded the provisions of the charter and individual policies. Indeed, the JHM charter was itself created by legislation, see St. 1862, c. 125, which provided that the corporation would be "subject to . . . all other [legislative] acts which are or may be in force relative to such companies." Thus, absent a claim that the conversion statute itself violated their rights, the plaintiffs must focus their contract claims on alleged violations of § 19E. See *Municipal Light Co. of Ashburnham* v. *Commonwealth*, 34 Mass. App. Ct. 162, 171, cert. denied, 510 U.S. 866 (1993), quoting from *New Orleans Waterworks Co.* v. *Louisiana Sugar Ref. Co.*, 125 U.S. 18, 30 (1888) (impairment of contract clause in United States Constitution concerns "the legislative power of the State, and not . . . [the] decisions of its courts, or the acts of administrative or executive boards or officers, or the doings of corporations or individuals").

The plaintiffs' allegations that particular features of the conversion plan violated their individual policies are merely reiterations of the objections raised in the administrative proceeding.[17] The breach of fiduciary duty claim (count VIII), reduced to its essence, alleges that the conversion plan was unfair to members. This question was, of course, addressed in great detail by the commissioner, as the conversion statute charged her with determining that the plan was "fair and reason-

---

[17]Likewise, count IX of the complaint, which alleges a violation of the conversion statute, has already been disposed of in count I, the c. 30A appeal.

able" before she could approve it. Thus, adjudication of both the fiduciary duty claim and the contract claims is "dependent on the substance of the commissioner's determinations during the [administrative] proceedings." *LIFE*, 409 Mass. at 748. The claims were thus properly dismissed. *Ibid.*

As to the c. 93A claim (count X), for the most part, it too boils down to an assertion that the policyholders were not adequately compensated or that the company's charter or members' policies were violated. See our discussion, *supra.* In addition, the complaint asserts that the information packet — provided by JHM to its members as a basis for the members' vote on whether to approve the plan — was misleading, insufficient to allow members to cast an informed vote, and designed to induce a positive vote. (It may be recalled that the plan was approved by 93.72 percent of the votes cast.)

It appears from the record that the plaintiffs complained to the commissioner about the adequacy of the information packet, and that she addressed their criticisms in her decision, finding that the packet was not misleading. We note in particular the commissioner's responses to the plaintiffs' complaints regarding the adequacy of the packet's disclosures concerning the percent of policyholders who would receive cash as opposed to stock in the conversion; the specifics of the anti-takeover provision; and policyholders' entitlement to compensation even if they voted against the plan.

The commissioner was correct in noting that § 19E "does not specify the scope of the notice or information that an insurer seeking to demutualize must provide to its policyholders." However, the commissioner is not without experience in determining whether information disseminated by an insurance company is misleading or contains misrepresentations. See G. L. c. 176D. Here, because the commissioner's determinations with respect to the particulars of the information packet disclosures are so intertwined with her statutory mandate to determine whether the plan is fair, reasonable, and nonprejudicial, we conclude that deference to the experience and expertise of the commissioner in these circumstances is appropriate and the c. 93A claim was properly dismissed. Compare *Murphy* v. *Administrator of the Div. of Personnel Admn.*, 377 Mass. 217, 221

(1979), quoting from 3 Davis, Administrative Law § 19.01, at 5 (1958) (the court "should not act upon subject matter that is peculiarly within the agency's specialized field without taking into account what the agency has to offer"); *Nader* v. *Allegheny Airlines, Inc.*, 426 U.S. 290, 304 (1976), quoting from *Far East Conference* v. *United States*, 342 U.S. 570, 574-575 (1952) ("review by the judiciary . . . more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure"). Cf. *J. & J. Enterprises, Inc.* v. *Martignetti*, 369 Mass. 535, 541 (1976) (stay of court proceedings in c. 93A action appropriate pending administrative action in matter involving agency's expertise); *LIFE*, 409 Mass. at 751 (ordinarily, where there is overlapping jurisdiction between the commissioner and the Superior Court, the court action should be stayed pending action by the commissioner); *Frank J. Linhares Co.* v. *Reliance Ins. Co.*, 4 Mass. App. Ct. 617, 622 (1976) (court may refer c. 93A allegations to Commissioner of Insurance "for initial determination whether an unfair practice has been committed"). The plaintiffs have cited no authority, and we find none, to suggest that deference to the agency decision in these circumstances is in error.[18]

As the plaintiffs sought declaratory relief in counts II-IX, the judgment with respect to those counts is modified to provide that the plaintiffs are not entitled to the relief they seek. As to counts I and X, the judgment is affirmed.

*So ordered.*

---

[18]Given the conclusions we have reached concerning counts II-X, there is no need to address the plaintiffs' contentions that the trial judge erred in converting the motion to dismiss into a motion for summary judgment.